We'll call the case of H.R. Staffing Consultants, L.L.C. et al. v. Richard Butts, Mr. LaRocco. Thank you, Your Honor. May it please the Court, Anthony LaRocco, I represent the appellant Richard Butts in this matter. I will be reserving two minutes for rebuttal, Your Honor, if that's okay.  Thank you, Your Honor. This is a garden-variety breach-of-contract case, otherwise made much more complex and made much more high-state by a crippling injunction that was imposed by the trial court for what we believe to be no good reason. Why, you say crippling, though he's employed by the employer with whom he'd like to work. Yes, he's employed, Your Honor, he's employed outside of the job that he had originally been given. He was the vice president for cardiovascular services, taking a broad sweep of the entire healthcare system in Hudson County. Now he is relegated to serving a small facility outside the geographic scope of the non-compete, and he serves only the administrative folks at that facility, a vastly different job. He is not serving the public in the delivery of healthcare in Hudson County, over 600,000 people. Well, he's not providing individualized direct patient care. No, he is not, Your Honor, that's clear. But he is administering the cardiovascular services for the entire system and four other facilities for that entire system. When you say this is really, you know, you do make it sound very dramatic, but this is limited in its geographic scope, it's limited in its time, it's limited in ways which are typically upheld by the courts. So, you know, why should we say this is a dramatically terrible thing, that they're enforcing a non-compete that your client agreed to? Well, for a number of reasons, Your Honor. First of all, first and foremost, there was no irreparable harm that was demonstrated, which is prerequisite from the outset. The judge says, the district court judge said, look, this intermediation is a real problem for a business, a temporary staffing business, and if you allow this to happen, it destroys the very business model on which they're established. So, you know, what's wrong with that reasoning? Why isn't that just the same as saying, you know, it's a real problem if real estate buyers and sellers, once they're put together by a real estate agent, just decline to pay real estate agents? Well, for a number of reasons, Your Honor. First of all, that issue speaks directly to the probability of success problem of a four-factor test. But doesn't it also speak to, you were saying no irreparable harm, that's where you started, and I'm trying to direct you at what I understood the district court's response to that to be to say, that's a kind of irreparable harm. Didn't he identify that as an irreparable harm? He did. What's an abuse of discretion in his recognizing that as a kind of irreparable harm? If you look to the underlying factor, Your Honor, with respect to how the disintermediation factor played into Judge McNulty's analysis, it's a de novo, we submit that it is a de novo analysis for this court to undertake, primarily because it was a matter of contract interpretation and a misapplication of the law to the facts in this way. In all the disintermediation cases that were cited by the other side, not one of them dealt with the contract that we have in play here, which is the PSA contract, the preferred staffing agreement contract. That contract specifically said at Section 1D that upon notice by care point, the care point entity can hire directly the long-term personnel without placement fee having to be paid. And he reads that contract and says that's not a waiver of the non-compete, that's a statement that we won't charge a fee in the event that such a hiring is to go forward. But if we read the PSSA the way you do, there's a separate non-compete within the PSSA itself, not just the non-compete with Mr. Butts, but in the PSSA it says that care point cannot, quote, solicit direct influence or attempt to influence or hire any employee or independent contractor, employee engaged by the party within the preceding six months. If we read the contract the way you're suggesting, don't we just read out of the PSSA another provision which is directly in the document? No, Your Honor, and here's the reason why. This particular carve-out only dealt with LTP Exhibit D individuals, LTP meaning long-term personnel. It was specifically negotiated by care point and by HR staffing that this carve-out would apply as to a specific genre of individuals, long-term personnel who were already placed at care point for a very long period of time. In the case of Mr. Butts it was four years. And in that instance, and we have the testimony of the chief counsel of HR staffing who actually negotiated this deal, he said the reason why that is in there is because care point did not want to. So what that means, what that contract means, and that specific provision means, is something that the judge took evidence on and made a fact-finding on, right? No, Your Honor. Well, if he's taken evidence on it and you're citing the evidence, doesn't that mean that this is actually some contract interpretation going on here and the judge is trying to get to the meaning behind this? Yes, Your Honor. There was contract interpretation based upon the very limited evidence that was elicited. The judge really did not, he interpreted that language sort of in a vacuum. He did not focus on what Mr. Bakker had testified to. I don't believe he cites Mr. Bakker's testimony in his opinion. Well, let's talk a little more about irreparable harm. Yes, we can. In addition to the intermediation issue, what about the finding that the confidential business information that Mr. Butts had could easily be disclosed to care point and that could cause irreparable harm? He's still at care point, so he still could very easily disclose it, Your Honor. In fact, what the court had found was just by virtue of his position, that information could be disclosed. Well, we contend, Your Honor, that he can be at care point or he can be anywhere else and that information could be disclosed, first. Secondly, we take serious issue with the fact that the information, number one, was confidential. Confidential plans, we feel, Your Honor, that ultimately when discovery is taken, that these were fanciful aspirations of these three opportunities. The only evidence in the record was Mr. Howard's testimony taken with respect to what these opportunities, so-called opportunities, were. And by his own admission, he said these were very nascent. I think he used the word nascent. These were very preliminary discussions. I think some of the e-mail traffic going back and forth to Mr. Butts, who was given this information after Mr. Butts had already told them he had an employment offer from care point. The district court has made a finding that it found that information confidential. And again, as Judge Shorten was talking about, we're reviewing that sort of fact-finding at a very difficult standard for your client to overcome. How can we possibly disturb his conclusion that that information was confidential? And following up on what Judge Fisher was saying, that the risk of disclosure of that information could cause irreparable harm. Your Honor, assuming that it was confidential, and we take great issue with that, these were speculative at best. Judge McNulty did not delve into exactly what these opportunities were. He heard no testimony from representatives on the other side of the so-called opportunity. He took the word of Mr. Howard, who testified very candidly that these were very nascent, very beginning discussions that we were having. These were speculative opportunities. The law does not allow an injunction to be imposed upon a mere speculation where there is a remote possibility down the line that there might be disclosure that might impact somehow negatively on a case like this. Mr. Loacco, if we concluded that there was a likelihood of success on the merits, could we separately and independently conclude that there was no irreparable harm? Yes, Your Honor. How could we distinguish the two? The irreparable harm standard requires, and I'll quote, more than a risk of irreparable harm must be demonstrated. The requisite injunctive relief has to be a clear showing of irreparable harm that is immediate. Even if you find that there is a likelihood of success on the merits, what we're really talking about here is a money damage claim. It's Mr. Butts. We're talking about one person who was caught. How can you say that? How can you say it's just a money damages claim? The district court makes a specific holding and says this actually isn't just a one-off money claim. This actually destroys the business model on which the business itself is founded. You may disagree with that, but how is that not something beyond mere money? Your Honor, we believe that the court, in making that finding, misinterpreted the plain language of Section 1D of the Health Care, the Care Point, and HR Staffing Agreement. That language was specifically negotiated. It is clear on its face. Upon notice, there's a carve-out. It was a specific carve-out for about 50 individuals and 50 individuals only, and it was listed on Exhibit D. And it says- Well, you've quoted that for us already, right? So why don't you respond to your own reply brief here, right? You say in your reply brief, footnote 2, page 16, Plaintiffs also cite the non-solicitation clause within the PSSA. However, that clause likewise provides that its prescription applies only, quote, except with prior written consent of the other party, which may be provided or withheld at the party's sole discretion, close quote. Thus, that clause was also waived by Section 1D. So the position you're taking is that in negotiating the PSSA, they created an internally inconsistent document where one section waives another section. Yes, Your Honor. What canon of construction of contracts would lead us to believe that that's an appropriate way to read those two subsections together? The canon I believe, Your Honor, is you need to focus on the specific over the general. And the specific language that is part and parcel of the analysis here is if you take 1D and you juxtapose it against Mr. Butts' non-compete, his non-compete clause expressly states that it says, except upon written consent of HR staffing. And our argument is that the written consent of HR staffing was provided specifically in their PSSA agreement at Provision 1D, which specifically says, plainly, upon notice by care point, these existing LTP staff can be hired directly. What about the miscellaneous provision where it talks about the applicability of this agreement? And it says in the second sentence, employees of staffing company placed within care point prior to such effective date and other employees working in the joint venture shall continue to operate under the terms of their individual engagements. It's, Your Honor, that is, again, a general, specific, I'm sorry, a general provision that deals with Sounds pretty specific to me. Well, Your Honor, it doesn't, it has to take second tier to the specific section that was negotiated. That was 1D, the carve-out for the LTP employees. But the plain language of that carve-out was simply to waive the placement fee. It didn't say anything else, did it? Where is the clear, unequivocal, decisive waiver that you want us to read into this contract? Your Honor, to the extent that the language is, as you say, perhaps it's ambiguous. We say it's clear on its face. The only condition there was upon notice, care point can directly hire. And it says, can directly hire. It doesn't say subject to any condition. It doesn't say subject to a non-compete or a non-solicitation provision. The specific negotiation was for these 50 folks to be, for care point to be able to directly hire without having to pay a placement fee because HR staffing, as the testimony indicated, was already paid. So it's your position that the people on the list in Exhibit D are not covered by the non-solicitation clause and not covered by the miscellaneous paragraph I just read? That's the way we read it, Your Honor. That is an interpretation, contractual interpretation. To the extent that Your Honor disagrees, therein lies an ambiguity by construct. All right? So to the extent that there is an ambiguity, perhaps at some point in time, appropriate extrinsic evidence would have to be taken, and the extrinsic evidence would have to bear upon the party's intent at the time they entered these agreements and the PSA agreement specifically. That was not done in this case, Your Honor. The only indication we have is the language that's plain on its face and that's very specific and it's uncontradicted that it was negotiated for. And as a result of that negotiation, Care Point actually gave a preferred status to HR staffing, which it did not have initially. We had Ms. Dobin testify before Judge McNulty, and she said, had we known that we were going to be subject to and not compete with respect to these 50 folks on this Exhibit D, we would never have entered this agreement. Okay. She said that expressly. All right, Mr. Uraga, we'll have you back on rebuttal. Thank you. Mr. Argeropoulos. Is that close? Your Honor, nail it. Argeropoulos. Argeropoulos. Argeropoulos. Anthony Argeropoulos for the plaintiff in this case. This is more than a garden variety case. There is no crippling injunction that's in place here. The arguments that we heard counsel make are really arguments on behalf of Care Point, who they represent in a separate action and who were sort of on the fence on this case early on. Care Point's not a party. The two parties are Mr. Butts, the former employee, and HR staffing, the employer. There is an unambiguous employment agreement in place that contains a fairly common type of restrictive covenant. It's one year. It's five counties, generally enforceable. It has specific provisions as to when and how that agreement can be modified. Well, you'd agree, wouldn't you, that the document that was negotiated with Care Point, this PSSA, as we've been referring to it in the briefing in here, has bearing on this dispute, right? I mean, Care Point isn't in the room, but that document weighs heavily in the decision of Judge McNulty, and it certainly bears on the arguments the parties have made to us, right? I disagree, Your Honor, respectfully. The PSSA was injected into this case by the defendant to make an argument that somehow, despite the fact that Mr. Butts was previously employed, had an employment agreement in place with HR staffing, despite the fact that Dennis Kelly, who was a former partner of HR staffing at Upstream and became the CEO of the Care Point Hospital, during the time that he was a partner at Upstream, he was well aware and HR staffing was well aware of these restrictive covenants. They knew that they were in place. The argument is that somehow Mr. Butts should be a beneficiary of the PSSA. He simply isn't. Well, yeah, that's your legal argument. My point is it's a legal argument that's based on discussing whether the PSSA has bearing on the case or not. The very fact that we're talking about it means it's in the case. You're right. They've injected it. It's their argument, but it's something that the district court judge had to deal with and that we've got to deal with, so we might as well deal with it. They say the PSSA is the written agreement. It is the statement by your client that they waive the non-compete as to a certain class of employees, including Mr. Butts. So, you know, what's wrong with a factual argument that one bears on the other? Well, the argument itself is wrong for a number of reasons. Before I get to those reasons, Judge McNulty, the trial court, analyzed and addressed those factual issues, and the question is, you know, was his determination clearly erroneous? We, of course, say that it's not. And the reason why the interpretation is wrong, not just incorrect but wrong, is that in order for there to be a waiver, it has to be a knowing and voluntary, clear and unmistakable terms. That's basic New Jersey Supreme Court construction of waivers. The fact that we're having this discussion, I would say, indicates that you can't take the position that this is a knowing and voluntary waiver of any rights under the employment agreement of Richard Butts, which isn't specifically referenced. Number two, we have a provision that says that to the extent that there are employees who were previously employed, they're governed by their employment agreements. So we do have a specific reference in the PSSA itself to these other employment agreements that contain restrictive covenants. That's number one. Number two, the way that the defense reads this contract makes it internally unworkable. While they say there's a waiver here but there's not a waiver there, ultimately, if you take the position that the PSSA contains a specific waiver of Mr. Butts' restrictive covenant, you're rendering, frankly, you're nullifying the restrictive covenant contained in the PSSA itself. Then what do we make of it? I mean, this is language. These are sophisticated parties. You all are big kids getting together in a room and working stuff out when you make this contract. Section 1B of the PSSA says, quote, upon notice by CarePoint these existing LTP staff can be hired directly by CarePoint without payment of a placement fee, close quote. What does that mean? If it doesn't mean exactly what it says. CarePoint gives you notice. It wants to hire somebody on that list. It gets to do so and it gets to do so without paying a placement fee. It means that and it means nothing more than that in the event that CarePoint were to hire someone from that list, after a discussion of the parties, they would not have to pay a placement fee. Where do you get that out of the language? These existing LTP staff can be hired directly. Upon notice by CarePoint, these existing LTP staff can be hired directly by CarePoint. It seems that that's putting the decision-making in CarePoint's hands, doesn't it? It may seem that way if you read that provision outside of the remaining terms of the PSSA. We have a non-compete. We have a provision that says that the LTP employees, all employees, who are subject to employment agreements will continue to perform pursuant to their agreements that contain non-compete provisions. And it also ignores the testimony by the party who negotiated this agreement, which is Stuart Balker, who testified very clearly that the question was, was 1D of the PSSA meant to counteract or in any way be an exception to the non-compete provision in Section 6? Mr. Balker's deposition was marked and portions of it were accepted as direct testimony in the case, both by the plaintiff and by the defense. Mr. Balker answers, no. And why did you believe that it was not? It's very clear that it's related to the placement. It's related to the existing staff payment of a placement fee. Question, did Ms. Prezant, that's the person who negotiated for CarePoint, ever during the course of negotiations say to you that she wanted the ability to hire the employees listed in Exhibit D, including Mr. Butts, at any time, whether or not HR staffing consented to it? No. Did Ms. Dobin ever say that to you? No. If any of those people ever said that to you, what would your response have been? It would have been red flags. I would have gone to talk to Chris and Paul, the owners, because the deal would not have been worth it. So to the extent that if you were to read this provision nakedly, without consideration of the fact that prior employment agreements are referred to expressly, without regard to the fact that we have a non-competition provision in the PSSA, in disregard of the New Jersey Supreme Court's guidance on when you have a knowing and voluntary waiver in clear and unmistakable terms, you have Stuart Barger, the person who negotiated it, saying no, that's not at all what it meant. It referred specifically to the placement fee, which is specifically referred to in that provision. Mr. Agropopoulos, let's go on to the question of irreparable harm. The court has to properly find that there is irreparable harm, and if there is not irreparable harm here, the injunction should not have been issued, and that finding would be an error of law, and as such be an abuse of discretion. Butz is wherever he is with CarePoint now. If he has any vital information, any confidential information, he can easily pass it on. Where's the harm here? There are two components of the harm. The first is this intermediation concept, cutting out the middleman harm, and the second is... But you already waived that concern by saying if you hire these people, you don't know any placement fee. No. The precursor to hiring anyone would be the agreement and a knowing waiver as to those people. In the history of this case and the facts on the record in this case, CarePoint reached out to certain people, asked us to facilitate meetings. In fact, Mr. Butz himself signed a document. The document says CarePoint wants to meet with you in order to discuss a potential employment opportunity. We are not waiving any claims, any rights under our employment agreement with you that contains a restrictive covenant. So the reality is that even the conduct of the parties demonstrates that there was no willy-nilly pick-and-choose, whoever we want. There had to be some discussion in place. So to the extent that there's an argument that somehow the payment of a placement fee impacts this intermediation, we disagree on the basis that... Yeah, but get back to the irreparable harm finding. I mean, there's a one-page... The analysis was one page. They talked that the district court found irreparable harm, one, potential harm Butz could do by sharing HR staffing's confidential business information with CarePoint, which he could do now by picking up the phone. In violation of an order. If you were to violate the court's order, sure. Yeah. And second, the harm to HR business model and contractual rights caused by the continued employment violation in non-compete. Okay? Now, you know, how is that irreparable? I mean, you can replace that with money damages. No, we can't for the following reasons. I want to move away from the disintermediation argument for a second. That's more of a theoretical argument. Yeah, I want you to. Let's talk about confidential information. The court heard testimony at length. At length. Not pie-in-the-sky testimony of this is what we want to do someday, and this is what we discussed with Mr. Butz about we want to do someday. But real, concrete evidence, naming names, naming dates, naming subject matter, of real discussions, live discussions with CarePoint's competitors. Now, under the PSSA, which is particularly relevant on this point, although HR staffing and upstream would have the ability clearly to negotiate and discuss a potential competitive venture against CarePoint during the time that the PSSA was enforced, they cannot operationalize it. They cannot. All they can do at that time is negotiate and talk. In March of this past year, those discussions started. They were in full swing, continuing, at least from the perspective of the record, through the date that the record was created, and I can represent that they're continuing. But the fact of the matter is that Mr. Butz was made privy to very, very specific plans that he was a part of, the plans to develop and how to develop competing lines at hospitals that by zip code, according to Mr. Butz himself, compete for the same patients and compete for the same physicians to join the joint ventures. They weren't hiring Butz for that purpose. He was vice president of cardiac services. As vice president of those services, his responsibility is to oversee, manage, develop, all the cardiovascular service lines. I gather that the reason why, if I read the record right, that this information, while in its earlier stages became so valuable to your client, is these communications are all happening around the time the state court action is filed and a reasonable inference could be drawn. The relationship between CarePoint and HR staffing is falling apart, and then we see again we only have the benefit shares of the record developed. We see the complaint get filed on March 20th. We see the overtures of offers of employment, including one on March 31st to Mr. Butz, and then we see April 15th, 17th, and 19th, these e-mails discussing these future plans with these competitors. And so is it your position that it became sensitive right around the same time the relationship was falling apart, and while you could disclose it now, you really don't want them to disclose it because that is your livelihood considering the fact that the preferred staffing agreement was going to expire? Right. That's exactly it, Your Honor. In other words, what's happening right now today, today, the staffing agreement has been terminated. The relationship is terminated. We're now in a position where those negotiations can become fruitful and they can operationalize. If Mr. Butz were to be reinstated into that position as the head of the cardiovascular line, overseeing and developing the cardiovascular line relationships with physicians at the hospital, he can't help but not take a defensive position knowing who his former employers are talking to, what those former employers are talking to those folks about, knowing that there's going to be a battleground coming up, or is happening right now perhaps, as to the very physicians and the patients and the livelihood of these various systems. Where are we in the progress of this non-compete? How many months have expired on it? How many to go? The non-compete will expire in February of this year. February of 2016. My apologies. So whatever he knows, he's going to be able to disclose in February. And that's why it's critical that right now my clients can perform. Is the order structured in such a way that you can keep him from disclosing that information today? Yes. He's prohibited from disclosing that information. And he's prevented from working in a capacity where the inevitable disclosure and use of that information would occur. That position is his former position at CarePoint.  Okay. All right. Thank you, Your Honors. Thank you, Mr. Morocco. Thank you, Your Honor. Just a few brief points, Your Honors. Number one, the record is absolutely devoid, and no findings at all have been made that Mr. Butts was prepared, was poised, as all the cases indicate, had any suspicious activity as to whether he was going to disclose anything. In fact, the record is just beyond this. That doesn't speak to the point that Mr. Argyropoulos said a moment ago, which was even if he doesn't disclose it, he can't help but act on it. He can't segment that part of his brain away, and it will impact business decisions he makes. That's irreparable harm all by itself. Please speak to that. Yes, Your Honor. That sounds a lot like to me is consistent with the inevitable disclosure doctrine, the national starch case in New Jersey. Inevitable disclosure was never, ever raised below before Judge McNulty. It was never raised in the briefs. Judge McNulty made no findings with respect to inevitable disclosure. All he said is he could. Well, he said Butts could. I understand the argument to not be inevitable disclosure. I understand their position to be inevitable use. Even if he never utters a word about it, it will affect business decisions that he makes, and that all by itself is irreparable harm. That's what I'm trying to get you to respond to. That is a huge leap of logic. What this man does primarily is assist in the delivery. He doesn't do it himself, but he assists in the delivery of health care from a cardiovascular standpoint. He has already served three and a half months of this injunction, we believe, improperly, unlawfully. He has repeatedly said, All I want to do is get back to work. I have no intention of competing. I didn't believe these so-called opportunities were real. They were pie in the sky as far as I'm concerned. Frankly, the court is retaining jurisdiction over this case. Discovery is proceeding. If there is a hint that Mr. Butts is engaged in some sort of disclosure, my adversaries are going to know about it, and they will run right into Judge McNulty and seek the appropriate relief. There was no irreparable harm here, and there cannot be. Okay, Mr. O'Rourke, thank you and both counsel for a job well done, and we'll take this matter under advisement. Thank you.